IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kristen L. Mix**

Civil Action No. 20–cv–02096–KLM

AMANDA CLAYTON,

      Plaintiff,

v.

DREAMSTYLE REMODELING OF COLORADO, LLC,
DREAMSTYLE REMODELING, INC., and
PAUL WATKINS,

      Defendants.

---

## ORDER

---

      Before the Court is "Defendants' Motion for Summary Judgment." *Motion* [#37].[1]

Plaintiff has responded in opposition to the Motion, and Defendants have replied.

*Response* [#41]; *Reply* [#45].  After considering the pleadings, the evidence submitted,

and the applicable law, the Motion is **GRANTED, in part,** and **DENIED, in part**.

### STATEMENT OF THE CASE

      Plaintiff Amanda Clayton ["Clayton," or "Plaintiff"] brings this lawsuit against her

former joint employers—Defendants Dreamstyle Remodeling of Colorado, LLC and

Dreamstyle Remodeling, Inc. [collectively, "Dreamstyle," or "Defendants"]—alleging

---

[1] "[#37]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Order.

violations of Title VII of the Civil Rights Act of 1964, as amended ["Title VII"], 42 U.S.C. §§ 2000(e) *et seq.*, and the Colorado Anti-Discrimination Act ["CADA"], Colo. Rev. Stat. §§ 24-34-402 *et. seq.*.  *Compl.* [#1]; *Am. Compl.* [#15].

### A.  Material Facts Pertinent to the Resolution of the Motion for Summary Judgment

The following facts are undisputed unless otherwise noted.  Dreamstyle is a full-service home-remodeling company that operates throughout the Western United States. *MacGillivray Decl.* [#37-1] ¶ 2.  Clayton, who is female, worked for Dreamstyle, as a Sales Representative at the company's Denver/Englewood branch, for a period of five and a half months, from March 19, 2019, until September 4, 2019.  *Watkins Decl.* [#37-5] ¶ 2; *Carroll Decl.* [#37-13] ¶ 3 & *Clayton Dep.* [#37-20] at 78.

At all times relevant to this lawsuit, Paul Watkins, who is male, served as the General Manager of the Denver/Englewood branch.  *Watkins Decl.* [#37-5] ¶ 3.  In that role, Watkins controlled Clayton's appointments and approved her leave requests. *Wilhelmi Aff.* [#41-1] ¶ 3 & *Clayton Dep.* [#41-2] at 72.  Plaintiff's direct supervisor, upon hire, was Sarah Pearse.  *Watkins Decl.* [#37-5] ¶ 3.  Beginning around May or June of 2019, and throughout the remainder of her employment with Dreamstyle, Clayton's direct supervisor was Alexandrea Vinet.  *Id.*

Dreamstyle's Harassment-Free Workplace Policy instructs employees to report alleged harassment as soon as possible, by either: (1) telling the alleged harasser (if the reporting employee is able to do so without conflict or danger); (2) reporting the incident to a direct supervisor, the company's human resources department, the company's president, or the company's legal counsel; or (3) if the employee prefers, anonymously

and confidentially reporting the alleged harassment via a 24/7/365 Safe Hotline.   *Carroll Decl.* [#37-13] ¶ 9 & *Dep. Ex. 2* [#37-14]; *Clayton Dep.* [#37-20] at 69.   Dreamstyle's Employee Handbook reiterates its Harassment-Free Workplace Policy, as well as the company's Non-Discrimination Policy, complaint procedures, Equal Employment Policy, Grievance Policy (specifically addressing workplace harassment and supervisor or coworker behavior), and how to report suggestions or concerns.   *MacGillivray Decl.* [#37-1] ¶ 3 & *Dep. Ex. 43* [#37-4].   During her employment with Dreamstyle, Plaintiff read, understood, and agreed to the company's workplace policies.   *Clayton Dep.* [#37-20] at 69.

Clayton alleges that, almost immediately after she began working for Dreamstyle, she was subjected to "inappropriate," "offensive," and "unwelcome" sexual conduct by Watkins.   *Am. Compl.* [#15] ¶¶ 2, 10, 22, 25, 33, 38.   In either March or April 2019, around the time of a workplace training session, Watkins showed four female trainees, including Clayton, an array of photographs he had taken in his part-time profession as a professional photographer.   *Carroll Decl.* [#37-13] ¶ 9 & *Dep. Ex. 4* [#37-15] at 4; *Clayton Dep.* [#37-20] at 97; *MacGillivray Decl.* [#37-1] ¶ 15; *Watkins Decl.* [#37-5] ¶ 5 & *Dep. Ex. 5* [#37-8]; *Watkins Decl.* [#37-5] ¶ 7 & *Dep. Ex. 1* [#37-6].   Many of the photographs depicted scantily-clad young woman.   *Watkins Decl. Dep. Ex. 1* [#37-6]; *Clayton Dep.* [#41-2] at 97-109; *Wilhelmi Aff.* [#41-1] ¶ 4 & *Vinet Dep.* [#41-3] at 36-43; *Wilhelmi Aff.* [#41-1] ¶ 8 & *Ontiveros Dep.* [#41-5] at 16-18.   Watkins' actions in displaying the photographs made Clayton feel uncomfortable.   *Clayton Dep.* [#41-2] at 99 ("I was, you know, in a very uncomfortable place emotionally[.]"), 107 ("[I]t was a very jarring

experience[.]").   Around that same time, Clayton observed a female coworker, who converses with Watkins, frequently dressed in inappropriate workplace attire.[2]   *Carroll Decl. Dep. Ex. 4* [#37-15] at 4; *Watkins Decl. Dep. Ex. 5* [#37-8]; *Wilhelmi Aff.* [#41-1] ¶ 6 & *August 29th Recording* [conventionally filed] at 17:57-18:45.   Those incidents also apparently made Plaintiff feel ill at ease.   *Carroll Decl. Dep. Ex. 4* [#37-15] at 4.

Around May 8, 2019, Watkins allegedly made a remark to Clayton regarding a mistake that she had made on a work assignment, although there is a factual dispute as to whether this happened and, if so, what was said.[3]   *MacGillivray Decl.* [#37-1] ¶ 17; *Watkins Decl. Dep. Ex. 5* [#37-8]; *Carroll Decl. Dep. Ex. 4* [#37-14] at 4; *August 29th Recording* [conventionally filed] at 18:57-19:13.   A few days later, around Saturday, May 11, 2019, in the late evening, Watkins called Clayton at her home, without forewarning, asking for a restaurant recommendation.   *MacGillivray Decl.* [#37-1] ¶ 18; *Watkins Decl. Dep. Ex. 5* [#37-8]; *Carroll Decl. Dep. Ex. 4* [#37-14] at 4; *August 29th Recording* [conventionally filed] at 21:30-22:53.   The phone call is alleged to have lasted for approximately ninety minutes.   *Am. Compl.* [#15] at 7 ¶ 32.   Clayton subsequently

---

[2] Clayton later complained to her employer that, during training, the female employee would sit "crossed legged [sic] on top of [Watkins'] desk." *Carroll Decl. Dep. Ex. 4* [#37-15] at 4.  The record shows that, when confronted about this allegation, Watkins conceded that the female employee "may have," on occasion, "sat on the corner" of his desk.  *August 29th Recording* [conventionally filed] at 18:00-18:35.

[3] Clayton subsequently complained to her employer, and now alleges, that Watkins threatened to "spank [her] butt."  *Carroll Decl. Dep. Ex. 4* [#37-15] at 4; *see Am. Compl.* [#15] at 6-7 ¶¶ 27-28.  The record shows that, when confronted about this allegation, Watkins denied any memory of making the remark, insisting that he instead most likely told Clayton, "What am I going to have to do, drag you behind my truck until you figure this thing out?"   *August 29th Recording* [conventionally filed] at 18:57-19:13; *Watkins Decl. Dep. Ex. 5* [#37-8].

complained to her employer that the conversation made her uncomfortable, due to the fact that Watkins was asking probing questions about her personal life, and because she felt that she could not hang up the phone. *Carroll Decl. Dep. Ex. 4* [#37-14] at 4. Plaintiff now alleges that, after the phone call incident, Watkins began to treat her "unfavorably." *Am. Compl.* [#15] at 8 ¶ 35.

A few weeks later, during a sales meeting, Watkins told Clayton that she should try to get her husband, who was reportedly a "sales guru," to teach her how to be a better salesperson. *MacGillivray Decl.* [#37-1] ¶ 19; *Watkins Decl. Dep. Ex. 5* [#37-8]; *Carroll Decl. Dep. Ex. 4* [#37-14] at 4. The parties dispute the specific words that Watkins used,[4] though it is clear from the record that the comment was made in front of the entire Denver/Englewood branch sales team. *Id.*; *Vinet Dep.* [#41-3] at 66-67; *Ontiveros Dep.* [#41-5] at 39-40, 80. Clayton alleges that she felt "humiliated and demeaned" by this incident. *Am. Compl.* [#15] at 9 ¶ 38.

On August 21, 2019, at another weekly sales meeting attended by Clayton, Watkins, unprompted, told the sales team about a female customer who had accused him of misconduct relating to a hug, referring to the customer as "crazy." *MacGillivray Decl.* [#37-1] ¶ 20; *Watkins Decl. Dep. Ex. 5* [#37-8]; *Carroll Decl. Dep. Ex. 4* [#37-14] at 4. Watkins also remarked about a gift basket that he had given to another female customer.

---

[4] Clayton alleges that Watkins told her to "start bribing [her husband] with sex." *Am. Compl.* [#15] at 9 ¶ 37; *see Carroll Decl. Dep. Ex. 4* [#37-15] at 4. Two of Plaintiff's coworkers testified to witnessing Watkins make this comment. *Vinet Dep.* [#41-3] at 66-67; *Ontiveros Dep.* [#41-5] at 39, 80. Defendants have produced contrary evidence suggesting that Watkins instead told Clayton that she "should cook [her husband] his favorite dinner or do whatever to get him to coach [her] more." *Watkins Decl. Dep. Ex. 5* [#37-8].

*Id.*   That same week, Watkins spoke with Clayton's then direct supervisor, Vinet, regarding perceived deficiencies in Clayton's job performance.  *Carroll Decl.* [#37-13] ¶ 4 & *Vinet Dep.* [#37-21] at 169-74.  During that conversation, Watkins told Vinet that he was "done with" Clayton, though it is unclear from the record whether Watkins meant that he intended to terminate her employment.[5]  *Id.*  Vinet, in response, asked Watkins for "one more month" to work with Clayton.[6]  *Vinet Dep.* [#37-21] at 174.  Watkins agreed.  *Id.*

On Saturday, August, 24, 2019, Vinet met with Clayton to discuss Clayton's job performance.  *Vinet Dep.* [#37-21] at 174-75.  The two women brainstormed ways that Clayton could go about improving her sales numbers.  *Id.* at 175-78.  Vinet encouraged Clayton to take time off from work to "recoup."  *Id.*

That Monday, August 26, 2019, at 12:43 p.m., Clayton sent an email to Dreamstyle's President, Larry Chavez, Sr., in which she lodged a formal complaint regarding Watkins' workplace behavior.  The email read, in relevant part, as follows:

> I am writing to express my deep and troubling concerns with the environment and culture within the Denver office.  I have struggled with how and if I should voice my experience and concerns, but I feel that it is absolutely the right thing to do to make the company aware.  I will try to be as clear as possible and go chronologically.
>
> * * *
>
> I was hired in March 2019 and trained for several weeks in the Denver office along with three other female employees.  Training consisted of direct training with either Sarah Pearce (former Sales Manager) or Paul Watkins.

---

[5] During her deposition, Vinet categorically denied that Watkins expressed an intent to fire Clayton prior to August 28, 2019.  *Vinet Dep.* [#41-3] at 51-52.  At the same time, however, Vinet admitted that "a week or so before" that date, Watkins did, in fact, tell her that he was "done with" Clayton. *Vinet Dep.* [#37-21] at 169-71.

[6] Defendants construe Vinet's statement as a request for Watkins to hold off firing Clayton.  *Motion* [#37] at 4 ¶¶ 9-10.  Plaintiff, on the other hand, interprets Vinet's statement as a request for additional time to familiarize herself with the duties of her own position.  *Response* [#41] at 5 ¶¶ 9-10.

The training times with [Watkins] were at times very uncomfortable.  Instead of training us for the actual job or sales training, we would spend hours and days in [Watkins'] office.  He would show us provocative photos from his time as a "photographer."  Several times he would allude to much more racy photos of a sexual nature.  This felt alarming and uncomfortable.  During training he also had a former female admin employee sit crossed legged on top of his desk.  This same female employee was also frequently grossly and inappropriately dressed for a business office.

* * *

After selling an appointment on [May 8, 2019], I reached out to [Watkins] to find out how to enter the Sale[.] . . . When I didn't hear back from [Watkins], I completed the paperwork the best I knew how.  [Watkins'] response was "Why did you do that?  That screws our numbers up.  I am going to have to spank your butt."

On Saturday May 12, 2019, I received a phone call late at night from [Watkins].  His reasoning for the call was for a recommendation for a restaurant in the Colorado Springs area which I was fine to provide.  The call then lasted for an additional 90 minutes of personal questioning from [Watkins].  I politely tried to end the call several times and he would continue asking questions.  Question[s] he asked me during this call ranged from my age and [] race, to questions about my family.  I honestly had to be cold during this call because I was not comfortable telling him I was uncomfortable and just wanted to end the conversation.

In another instance, during a staff meeting in June, the entire Sales Team was tasked with discussing their personal goals[.] . . . When it was my turn I discussed my goals at which point [Watkins] asked "So I hear that your husband is a Sales Guru and has started coaching you?  Perhaps you should start bribing him with sex?"  It was humiliating, demeaning and so beyond what is appropriate.

* * *

On the most recent occasion, during our weekly Sales Meeting on [August 21, 2019], [Watkins] brought up an interaction with a customer in which she accused him of inappropriately touching her when he hugged her, and told the Sales Team that she was crazy.  Later he boasted about another female client that he brought champagne and chocolates to.  It feels like everything always has a sexual undertone.  This is not the type of person I can or want to work for.

I truly feel that the dynamic shifted after that May 11th phone call.  I feel that I was potentially being groomed for a "closer" working relationship, and when I wouldn't oblige he wrote me off.  There are certainly apparent benefits to spending time with him outside of work, as evidenced with the

> partial and preferential treatment of other female employees.  I would also
> like to add that any request on my part for his professional guidance or
> feedback in the capacity of sales has been completely ignored.
>
> * * *
>
> In this current environment, I do not feel safe and am concerned that
> working with [Watkins] after this email will cause me to face even further
> discriminatory comments and practices against me that reduce my ability to
> perform my duties for Dreamstyle.

*Carroll Decl. Dep. Ex. 4* [#37-14] at 3-5.

Less than six hours later, at 6:22 p.m., Chavez responded to Clayton's email,

copying his Vice President of Operations, Andrew MacGillivray, to the correspondence.

*Id.* at 2-3.  The substance of Chavez's response read as follows:

> Thank you for this information.  We will begin an investigation immediately
> at top management level.  We will go as far as we can anonymously and
> hopefully we will get acceptable results that way.  If it becomes necessary
> to be more specific, we will talk to you beforehand.  In any event, the results
> of an investigation and any action taken will not have any bearing on your
> employment with [Dreamstyle].  I have asked Andrew McGillivary [sic], our
> new VP of operations[,] to handle this matter and he will keep me closely
> apprised as he is in the office next door to me.
>
> Again thank you, this is a serious matter and will be treated as such.

*Id.*  That same evening, MacGillivray separately emailed Clayton, asking to speak with

her "directly" at her "earliest convenience."  *Id.* at 1-2.  Clayton responded to

MacGillivray's email, agreeing to speak with him over the telephone later that same week.

*Id.* at 1.

That Wednesday, August 28, 2019, during a weekly sales meeting, which Clayton

did not attend due to a migraine headache, Watkins instructed Vinet to terminate

Clayton's employment, effective September 1, 2019.  *Vinet Dep.* [#41-3] at 45-47.

Watkins cited Clayton's poor job performance as the basis for his decision.  *Id.*  The

8

uncontroverted record shows that, when he instructed Vinet to fire Clayton, Watkins did not yet know about Clayton's harassment complaint.[7]  *Watkins Decl.* [#37-5] ¶ 4.

That same day, at approximately 4:30 p.m., Clayton and MacGillivray spoke on the phone regarding Clayton's allegations against Watkins.  *MacGillivray Decl.* [#37-1] ¶ 7; *Wilhelmi Aff.* [#41-1] ¶ 5 & *August 28th Recording* [conventionally filed].[8]  During that eighteen-minute phone call, Clayton identified at least four coworkers who she believed could substantiate portions of her allegations.  *August 28th Recording* [conventionally filed] at 3:35-11:17; *MacGillivray Decl.* [#37-1] ¶ 7(d)-(e).  In addition, Clayton expressed concerns about the protection of her anonymity.  *August 28th Recording* [conventionally filed] at 2:31-2:50; *MacGillivray Decl.* [#37-1] ¶ 7(b).  MacGillivray, in response, told Clayton that Dreamstyle took her allegations seriously, and informed her that the company would be launching an investigation into her claims.  *August 28th Recording* [conventionally filed] at 2:53-3:30; *MacGillivray Decl.* [#37-1] ¶ 7(a), (c).  MacGillivray assured Clayton that he would try to complete the investigation as quickly as possible, and that he would keep her "fully apprised" in the interim.  *August 28th Recording* [conventionally filed] at 12:20-51; *MacGillivray Decl.* [#37-1] ¶ 7(f).  Plaintiff, in response expressed concerns as to whether she felt "comfortable or maybe even safe" working

---

[7] Plaintiff attempts to dispute this fact, arguing that Watkins was already aware of her allegations against him, as of August 28, 2019.  *Response* [#41] at 7 ¶ 23 (citing *Vinet Dep.* [#41-3] at 169-74).)  However, Plaintiff does not direct the court to any countervailing evidence regarding when Watkins first learned of her harassment complaint.

[8] The parties do not dispute what was said during the August 28, 2019 phone conversation between Clayton and MacGillivray, though Defendants do dispute Plaintiff's characterization of the conversation.  *See Reply* [#45] at 3 ¶¶ 18-19 ("Defendants' statements are consistent with the recorded telephone call and there is no genuine dispute of material fact.")

under Watkins during the investigation's pendency, prompting  MacGillivray to ask what, specifically, would make her feel "more comfortable." *August 28th Recording* [conventionally filed] at 13:10-14:08; *MacGillivray Decl.* [#37-1] ¶ 7(g).  Clayton replied that she wanted to "avoid" Watkins, though she did not elaborate on what that might entail. *August 28th Recording* [conventionally filed] at 14:09-15:12; *MacGillivray Decl.* [#37-1] ¶ 7(g).  MacGillivray, in response, proposed making the following announcement to the Denver/Englewood branch: "I [MacGillivray] can go forward in saying that there is an active investigation and while this is happening you need to know that um, bluntly, Amanda [Clayton] will not be involved with the business for a couple of days." *August 28th Recording* [conventionally filed] at 15:19-32; *MacGillivray Decl.* [#37-1] ¶ 7(g). Clayton asked MacGillivray for additional time to "think about this," and MacGillivray readily agreed. *August 28th Recording* [conventionally filed] at 16:10-20; *MacGillivray Decl.* [#37-1] ¶ 7(g).  Before hanging up, MacGillivray told Clayton that he was available to speak with her further, stressing that Dreamstyle was looking to do "whatever's going to make you feel comfortable." *Id.* at 16:20-17:27; *MacGillivray Decl.* [#37-1] ¶ 7(g).

The next day, August 29, 2019, at 8:30 a.m., Clayton sent MacGillivray an email, the entirety of which reads:

> Hello Andrew,
>
> Thank you again for taking the time to speak with me.  After some thought and discussion with my husband, I feel that it will be best for me to take leave pending your investigation.  I really don't feel that I can work directly or indirectly in that environment and need to examine if I can in fact continue working there.  I will continue to cooperate with anything you need from my end.
>
> Amanda Clayton

*Carroll Decl.* [#37-13] ¶ 9 & *Dep. Ex. 14* [#37-17]; *Clayton Dep.* [#37-20] at 138-39. MacGillivray emailed back twelve minutes later, thanking Clayton for the clarification, and asking whether she intended to inform her colleagues of her decision, or whether she preferred that MacGillivray "handle that" on her behalf. *Carroll Decl. Dep. Ex. 14* [#37-17]. After receiving no response from Clayton, at 5:46 p.m. that evening, MacGillivray sent her a follow-up email, stating: "Amanda, I have alerted Paul [Watkins] and Sandra [the Denver/Englewood branch Office Manager] to the possibility of you taking a leave. I look forward to your direction at your convenience." *Id.*; *MacGillivray Decl.* [#37-1] ¶ 8. The next morning, August 30, 2019, Clayton sent a text message to Vinet, her direct supervisor, confirming that she was "on leave indefinitely." *Carroll Decl.* [#37-13] ¶ 9 & *Dep. Ex. 13* [#37-16]; *Clayton Dep.* [#37-20] at 44.

Meanwhile, on the afternoon of August 29, 2019, as part of their investigation into Clayton's complaint, Chavez and MacGillivray conducted a telephone interview of Watkins, during which Watkins learned for the first time of Clayton's allegations against him. *MacGillivray Decl.* [#37-1] ¶ 11; *Watkins Decl.* [#37-5] ¶ 4; *August 29th Recording* [conventionally filed].[9] A few minutes into the call, Watkins asked that the Denver/Englewood branch office manager, Sandra Lee-Zarlengo, be allowed to sit in and

---

[9] There is no dispute as to what was said during the August 29, 2019 phone conversation, although the parties disagree as to how that evidence should be characterized. *See Reply* [#45] at 5 ¶¶ 65-76 (Defendants disagree with and dispute Clayton's characterizations of the August 29, 2019 phone call interview of Watkins, many of which are taken out of context and add an argumentative gloss to the facts. The phone recording itself is the best evidence of what transpired and Defendants have no objection to the Court reviewing the recording Clayton provided.")

participate in the discussion.  *August 29th Recording* [conventionally filed] at 2:06-3:44.
Chavez and MacGillivray agreed to that request.  *Id.*  During the ensuing phone call, which
lasted for nearly one hour, Chavez and MacGillivray questioned Watkins about the
allegations set forth in Clayton's August 26, 2019 email.  *Id.* at 3:45-12:29.  Although
Chavez and MacGillivray made efforts to conceal Clayton's identity during the call,
Watkins surmised within a matter of minutes that Clayton was his accuser, insinuating to
the call's participants that he had previously intended to fire Clayton for her poor job
performance.  *Id.* at 12:30-13:21.  As the phone call progressed, Chavez and MacGillivray
each made various comments, suggesting that they were inclined to side with Watkins'
version of events, and expressing misgivings about speaking to any witnesses.  *Id.* at
36:25-37:00, 44:40-45:00, 46:40-47:20.  Towards the end of the call, the participants
discussed a plan as to how to create a document trail establishing Clayton's poor work
performance.[10]  *Id.* at 36:30-49:00, 53:20-54:17.  At the end of the call, Chavez remarked
that Clayton's leave of absence was "probably a good thing."  *Id.* at 49:20-49:45.  Watkins
then submitted a single-page written response to Plaintiff's allegations within twenty-four
hours of the phone call.  *Watkins Decl. Dep. Ex. 5* [#37-8].

The Labor Day holiday weekend that year ran from Saturday, August 31, 2019,
until Monday, September 2, 2019.  By the following Wednesday, September 4, 2019,
Clayton had come to believe that her employment with Dreamstyle had already been

---

[10] Later that same evening, Watkins informed Vinet about Clayton's harassment complaint.
*Wilhelmi Decl.* [#41-1] ¶ 13 & *Dep. Ex. 20* [#41-19] at 7-8; *Vinet Dep.* [#41-3] at 52-53.  Watkins
then instructed Vinet to draft a letter on his behalf, documenting Clayton's poor job performance.
*Id.*  Vinet, however, refused to do so.  *Id.*

terminated, based on text messages she allegedly received from her colleagues.  *Clayton Dep.* [#37-20] at 157-58.   Armed with that belief, Plaintiff sent the following email to MacGillivray that morning:

> Dear Mr. MacGillivray,
>
> I am writing in regards to both your investigation and my employment.  Since my initial contact last week, I have learned from my co-workers that during [the August 28, 2019] Sales Meeting, [Watkins] told the team that I wouldn't be employed there much longer.  During todays [sic] meeting, I was told that [Watkins] spent a great deal of the meeting defending himself against some of the claims I spoke out about, and although I wasn't specifically named, it's not difficult for the staff to figure out I am the one who made the complaints when I am the employee on leave.  This feels like blatant retaliation.  I am at an absolute loss, because I was ensured confidentiality and protection of my job during this process.  Not to mention how very unprofessional it is of him.  I can tell you that this has been incredibly stressful mentally and emotionally.  My impression is that Dreamstyle's priority is protecting [Watkins].  I don't feel that I am being given any options here.
>
> Amanda Clayton

*MacGillivray Decl.* [#37-1] ¶ 12 & *Dep. Ex. 26* [#37-3] at 2; *id.* at 152-53, 159.

Within a matter of hours, Dreamstyle launched an investigation into this new set of allegations.  *MacGillivray Decl.* [#37-1] ¶ 12; *Watkins Decl.* [#37-5] ¶ 6 & *Dep. Ex. 6* [#37-13], *Dep. Ex. 7* [#37-10], *Dep. Ex. 8* [#37-15].  Two Dreamstyle employees who attended the sales meeting earlier that day were asked to provide their written recollection of the events that had transpired.  *Id.*  In addition, Dreamstyle asked Watkins for his response to the new allegations.  *Id.*

The next day, September 5, 2019, MacGillivray emailed a response to Clayton.  *MacGillivray Decl.* [#37-1] ¶ 12 & *Dep. Ex. 26* [#37-3].  In his response, MacGillivray first copied and referred back to his August 29, 2019 emails regarding Clayton's decision to

take a leave of absence.  *Id.*  He then made clear that Clayton's position "remain[ed] open" and that Dreamstyle would "welcome [Clayton] back to active selling status," should she elect to return.[11]  *Id.*  MacGillivray then wrote:

> Since your first correspondence last Monday, we began an immediate investigation which is ongoing at this time.  This includes active involvement on the part of our CEO, Human Resources, and Legal team.  As indicated in our earliest correspondence, we would attempt to keep this anonymous.  Further, our investigation is, and will remain, impartial and unbiased.  Our goal is to verify the facts to the best of our abilities, in-line with standard procedures both at Dreamstyle, as well as most other companies across the country.  It is also important to note that throughout the entire organization we regularly reiterate the companies [sic] Harassment-Free Workplace Policy and our anonymous and confidential Safe Hotline available 24/7/365 (attached).
>
> As we work towards a positive resolution, corrective action will be taken to address any verifiable occurrences of harassment.  Meanwhile, just a reminder our investigation is ongoing and while you remain on a leave of absence, it is important to refrain from branch business-related contact.  This will definitely help to keep your anonymity.
>
> Thanks in advance and again, please know I am available to you at any time.
>
> ANDREW

*Id.*

Dreamstyle investigated Clayton's allegations by interviewing Watkins on August 29, 2019; by taking written statements from Watkins, Vinet, and another employee, Jonathan Hopper, regarding their impressions of the September 4, 2019 sales meeting;

---

[11] Clayton argues that MacGillivray's statement reassuring that her position would remain "open" was "disingenuous," citing to portions of MacGillivray's subsequent deposition testimony. *Response* [#41] ¶ 32.  However, the evidence referenced by Plaintiff shows only that Dreamstyle's investigation into her harassment complaint "was still ongoing" as of that date. *Wilhelmi Aff.* [#41-1] ¶ 7 & *MacGillivray Dep.* [#41-4] at 48.  Defendants, for their part, argue that MacGillivray's September 5, 2019 email "speaks for itself." *Reply* [#45] at 4 ¶ 32.

and by speaking with individuals from the company's human resources and legal departments. *MacGillivray Decl.* [#37-1] ¶ 13. However, aside from taking Vinet's written statement for that limited purpose, Dreamstyle did not contact any of the purportedly corroborating witnesses previously identified by Plaintiff. *Wilhelmi Aff.* [#41-1] ¶ 7 & *MacGillivray Dep.* [#41-4] at 39-40.

Relying most heavily on Watkins' statements, Dreamstyle, through its investigation, ultimately substantiated some, but not all, of Clayton's allegations. *MacGillivray Decl.* [#37-1] ¶¶ 13, 22. Specifically, based on Watkins' account, Dreamstyle confirmed only that Watkins had shown provocative photographs to female trainees; that he had called Clayton at her home outside of work hours in May 2019; and that he had made comments regarding female customers during an August 21, 2019 sales meeting. *Id.* at ¶¶ 15, 18, 20. However, Dreamstyle concluded that Watkins' remarks about female customers did not constitute sexual harassment of Clayton. *Id.* at ¶ 20. Dreamstyle deemed Plaintiff's remaining allegations against Watkins to be unsubstantiated. *Id.* at ¶¶ 16-17, 19, 21.

Based on the results of its investigation, Dreamstyle concluded that corrective action against Watkins was warranted. *Id.* at ¶ 22. On September 6, 2019, Dreamstyle issued a Corrective Action Form to Watkins, which was one step below termination. *Id.*; *Watkins Decl.* [#37-5] ¶ 8 & *Dep. Ex. 3* [#37-7]. Dreamstyle gave Watkins four specific expectations:

1. You must take and complete the Apex Sexual Harassment training course. This is a nationally recognized and California-compliant training.

2.   You must not share any photographs that you have taken with employees, either during or after business hours.
3.   Do not discuss topics that relate to sex, religion, ethnicity, or race with employees.  Topics to be discussed with employees must be related specifically to the business.
4.   Do not engage in extended private conversations with employees beyond what would be reasonable in the normal course of business.

*Watkins Decl. Dep. Ex. 3* [#37-7].  Watkins signed the Corrective Action Form and later completed the required sexual harassment training.  *Watkins Decl.* [#37-5] ¶ 9.

On September 30, 2019, Clayton emailed Chavez and MacGillivray once again, lamenting that "nothing ha[d] been done" to address her initial August 26, 2019 complaint, and alleging that Dreamstyle had since "retaliated" against her, by "forcing" her "to go on unpaid administrative leave, beginning on August 27th, 2019."  *MacGillivray Decl.* [#37-1] ¶ 23 & *Dep. Ex. 18* [#37-2] at 1-3; *Clayton Dep.* [#37-20] at 167-68.  MacGillivray responded to Clayton's email, on October 3, 2019, reiterating that Clayton's position "still remain[ed] open" and that Dreamstyle "would welcome [Clayton] back to active selling status," should she decide to return, though he did not propose any modifications to Clayton's work environment as it related to Watkins.  *MacGillivray Decl. Dep. Ex. 18* [#37-2] at 1.  MacGillivray made clear that, based on Clayton's August 29, 2019 email and her August 30, 2019 text message to Vinet, Dreamstyle understood Clayton's current leave of absence to be "entirely voluntary."  *Id.*  As to Clayton's complaints regarding the adequacy of Dreamstyle's investigation, MacGillivray wrote that the company "began an immediate investigation upon receipt of your August 26th email," and affirmed that "[c]orrective action would be taken to address any verifiable occurrences of harassment." *Id.*  MacGillivray stressed that he, Chavez, and Dreamstyle's Human Resources Director,

Steven Hawson, would remain available to discuss the matter further with Clayton, either by phone or in person. *Id.* After receiving MacGillivray's email, Plaintiff did not ever return to work at Dreamstyle, though she continued to receive compensation from the company for previously completed sales, up until October 25, 2019. *MacGillivray Decl.* [#37-1] ¶¶ 24-25; *Clayton Dep.* [#37-20] at 75-76. The uncontroverted record shows that, as of April 1, 2020, Clayton was still classified by Dreamstyle as an active employee. *MacGillivray Decl.* [#37-1] ¶ 25.

## B. Procedural History

On November 6, 2019, Plaintiff filed a charge of discrimination with the Colorado Civil Rights Division ["CCRD"] and the Equal Employment Opportunity Commission ["EEOC"], under those agencies' work-sharing agreement. *Carroll Decl.* [#37-13] ¶ 9 & *Dep. Ex. 44* [#37-18]; *Clayton Dep.* [#37-20] at 77-78. On July 17, 2020, after receiving notice of her right to sue from the CCRD, Plaintiff filed this employment discrimination action, initially against Dreamstyle and Watkins, ultimately asserting the following claims for relief: (1) Title VII sex discrimination against Dreamstyle; (2) Title VII sexual harassment/hostile work environment against Dreamstyle; (3) Title VII retaliation against Dreamstyle; (4) CADA sex discrimination against all Defendants; (5) CADA sexual harassment/hostile work environment against all Defendants; (6) CADA retaliation against all Defendants; and (7) intentional infliction of emotional distress ["IIED"] against all Defendants. *Compl.* [#1]; *Am. Compl.* [#15]. Plaintiff's IIED claims were ultimately dismissed as inadequately pleaded, and her remaining claims against Watkins were dismissed for failure to exhaust administrative remedies. *Order* [#53]. Dreamstyle now

moves for summary judgment on Clayton's remaining Title VII and CADA claims.  *Motion* [#37] at 1.

## STANDARD OF REVIEW

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex*, 477 U.S. at 325.  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works, Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead, must designate "specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c).

"A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)).  Whether there is a genuine dispute as to a material fact depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury," or conversely, whether the evidence "is so one-sided that one party must prevail as a matter of law.  *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (quoting *Anderson*, 477 U.S. at 251-52).  A disputed fact is "material" if "under the substantive law it is

essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing *Anderson*, 477 U.S. at 248).  A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*, 477 U.S. at 248).  "Where the record taken as a whole could not lead a rational trier of fact to find for the [nonmovant], there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

In evaluating a motion for summary judgment, a court may consider admissible evidence only.  *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1209–10 (10th Cir. 2010).  The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment.  *Concrete Works*, 36 F.3d at 1517.  However, this standard does not require the court to make unreasonable inferences in favor of the nonmoving party.  *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1276 (10th Cir. 2008).  The nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case.  *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994).

## ANALYSIS

### A.  The Title VII Claims

#### 1.  Relevant Background Law

Under Title VII, it is unlawful for an employer to discriminate against an employee because of her sex.   U.S.C.  §  2000(e)-2(a).   "Title VII's prohibition of employment discrimination based on sex encompasses hostile work environment sexual harassment."

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) (citing 42 U.S.C. §
2000e-2(a)(1); *Hirschfeld v. N.M. Corrs. Dep't*, 916 F.2d 572, 575 (10th Cir. 1990)).   In
addition, pursuant to 42 U.S.C. § 2000e-3(a), it is unlawful "for an employer to discriminate
against any of [its] employees . . . because [the employee] has opposed any practice
made an unlawful employment practice by [Title VII]."

Title VII claims can be established through either direct or circumstantial evidence.
*See, e.g.*, *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 969 (10th Cir. 2017)
(discrimination); *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1226 (10th Cir. 2008)
(retaliation).   If a plaintiff relies on circumstantial evidence, as Clayton does here, her
claims are analyzed under the *McDonnell Douglas* burden-shifting framework.[12]   *Singh v.
Cordle*, 936 F.3d 1022, 1037, 1042 (10th Cir. 2019).   Under this framework, the plaintiff
has the initial burden of making a *prima facie* case.   *Id.* at 1037 (citing *DePaula*, 859 F.3d
at 969-70).   If she does so, the burden then shifts to the employer to articulate a legitimate,
non-discriminatory reason for the adverse employment action.   *Id.* (quoting *Daniels v.
United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012)).   Once such a showing has
been made, the burden shifts back to the plaintiff to prove that the employer's proffered
reason is a pretext.   *Id.* (quoting *Daniels*, 701 F.3d at 627).

---

[12] This framework does not apply to Title VII hostile work environment claims.   *McQueen v.
Northrup Grumman Sys. Corp.*, No. 19-2743-KHV, 2021 WL 3164855, at *7 n.16 (D. Kan. July
27, 2021) (collecting cases); *see, e.g.*, *Jackson v. Kan. City Kan. Pub. Schs. Unified Sch. Dist.
No. 500*, 799 F. App'x 586, 590-92 (10th Cir. 2020) (analyzing a Title VII retaliation claim, but not
a Title VII hostile work environment claim, under the *McDonnell Douglas* burden-shifting
framework).

### 2. The Sexual Harassment Claim

The Court begins with Plaintiff's Title VII claim alleging a sexually hostile work environment. *Am. Compl.* [#15] at 15-18 ¶¶ 79-93. "To establish that a sexually hostile work environment existed, a plaintiff must prove the following elements: (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment." *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007) (alterations, citation, and quotation marks omitted).

In their motion for summary judgment, Defendants argue that Plaintiff has failed to adduce sufficient evidence showing "severe or pervasive" sexual harassment. *Motion* [#37] at 16-18. Defendants argue, in the alternative, that the *Faragher/Ellerth* affirmative defense bars Plaintiff's sexual harassment claim against them. *Id.* at 18-21.

### a. Severe and/or Pervasive Conduct

Title VII is not "a general civility code" for the office; thus, "the run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim." *Morris v. City of Colo. Springs*, 666 F.3d 654, 663-64 (10th Cir. 2012) (citations omitted). To be actionable under Title VII, the objectionable workplace behavior "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). While the conduct at issue need not be expressly sexual in nature, the evidence

of sexual harassment must be "either gender-based or [have] gender-related implications." *Riske v. King Soopers*, 366 F.3d 1085, 1091 (10th Cir. 2004); *see Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998) (stating that offensive conduct that is not overtly sexual, but nevertheless directed at the victim by the harasser because of the victim's sex, is actionable).

"[T]he existence of sexual harassment must be determined in light of the record as a whole, and the trier of fact must examine the totality of the circumstances, including the context in which the alleged incidents occurred." *Delsa Brooke Sanderson v. Wyom. Hwy. Patrol*, 976 F.3d 1164, 1174 (10th Cir. 2020) (quoting *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1096 (10th Cir. 1999)). "Such a thorough examination of the record is required because the very term 'environment' indicates that allegedly discriminatory incidents should not be examined in isolation." *Id.* (internal quotation marks and citation omitted); *see also Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1262 (10th Cir. 1998) (explaining that a factfinder should not "examine each alleged incident of harassment in a vacuum[,]" given that "[w]hat may appear to be a legitimate justification for a single incident of alleged harassment may look pretextual when viewed in the context of several other related incidents").

"Whether an environment is hostile or abusive can be determined only by looking at all the circumstances including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1219 (10th Cir. 2003) (quoting *Davis v. U.S. Postal Serv.*,

142 F.3d 1334, 1341 (10th Cir. 1998)).  The court must also consider "the social context in which the particular behavior occurs and is experienced by its target."  *Oncale*, 523 U.S. at 81.

To defeat a motion for summary judgment, the plaintiff alleging a sexually hostile work environment must "show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult."  *Delsa*, 976 F.3d at 1176 (citation omitted).  This requires a showing of more than "a few isolated incidents."  *Id.* (quoting *Morris*, 666 F.3d at 666).  That being said, "the severity and pervasiveness evaluation [of a hostile work environment claim] is particularly unsuited for summary judgment because it is quintessentially a question of fact."  *Id.* at 1177 (quoting *O'Shea*, 185 F.3d at 1098).

In support of her hostile work environment claim, Clayton references: (1) the incident where Watkins showed four female trainees, including herself, "sexually suggestive" photographs on his work computer, which depicted scantily-clad young women; (2) incidents where a provocatively-dressed female employee would sit atop Watkins' work desk; (3) the "spank your butt" comment; (4) the "start bribing [your husband] with sex" comment; (5) the May 2019 phone call; (6) Watkins' remark about a "crazy" female customer who had accused him of inappropriate physical contact; and (7) Watkins' remark about giving gifts to a different female customer.[13]  *Response* [#41] at 19-20; *see Carroll Decl. Dep. Ex. 4* [#37-14] at 3-5.

---

[13] Plaintiff also references: (1) unspecified incidents where Watkins "routinely mention[ed] his desire to photograph women," which Clayton and other female colleagues perceived to mean that Watkins "was looking for them to serve as his models;" and (2) the "sexual undertone" of Watkins'

While a close call, the Court finds that the evidence adduced by Clayton regarding these incidents, when viewed in its totality and in the light most favorable to Clayton, is enough to create a genuine issue of material fact as to whether Clayton was subjected to pervasive, if not severe, sexual harassment.  Indeed, a rational juror could conclude from the factual record that, during her brief tenure with Dreamstyle, Clayton experienced more than a few "isolated incidents" of workplace inappropriate conduct.  Specifically, and most salient to the Court's decision, Plaintiff has proffered evidence of at least seven discrete incidents of alleged sexual harassment occurring over the span of only five months of employment.  *See EEOC v. PVNF, LLC*, 487 F.3d 790, 799 (10th Cir. 2007) (finding sexually harassing conduct to be sufficiently pervasive such that a jury should decide the issue, where "the bulk" of the objectionable conduct occurred during a four month period, which the court characterized as "a relatively short period of time"); *Smith v. Century Concrete, Inc.*, No. 05-2105-JAR, 2006 WL 1877013, at *5 (D. Kan. July 6, 2006) ("While a few weeks is a short period of time, three inappropriate comments over this short span of time could amount to pervasive harassment in the eyes of a reasonable jury."); *Cadena v. Pacesetter Corp.*, 18 F. Supp. 2d 1220, 1228 (D. Kan. 1998) (holding that "a number of sexually suggestive and or sexually demeaning remarks, at least two of which were repeated on numerous occasions over a period which spanned only two to three months" was sufficiently pervasive to establish a hostile work environment).  Notably, every instance of objectionable conduct involved the same male supervisor.  And, the vast

---

"communications" to Clayton.  *Response* [#41] at 19-20.  However, Plaintiff provides no elaboration or evidentiary support for those allegations.

majority of the incidents concerned sexualized comments or behavior, a portion of which was directed at Plaintiff personally.  One such sexualized comment—*viz.*, that Clayton should "bribe [her] husband with sex"—was made during a sales meeting, in front of Clayton's colleagues. *See Smith v. Nw. Fin. Acceptance, Inc.*, 129 F.3d 1408, 1414 (10th Cir. 1997) (finding disputed material fact issues precluding summary judgment on a sexually hostile work environment claim, where a male supervisor made sexually disparaging remarks to the female plaintiff in "a relatively small, open space" office, within ear shot of the plaintiff's colleagues, and concluding that "[t]his public setting only increased the humiliation, and, therefore, the severity of the discriminatory conduct"). Further, there is credible evidence showing that other female employees were made uncomfortable by some of the same incidents about which Plaintiff now complains. *See, e.g.*, *Vinet Dep.* [#41-3] at 36-43; *Ontiveros Dep.* [#41-5] at 16-18; *Wilhelmi Aff.* [#41-1] ¶ 13 & *Dep. Ex. 20* [#41-19], *Dep. Ex. 31* [#41-21].  Finally, as to the May 2019 phone call, during which Watkins asked Clayton "personal" questions and made her feel "uncomfortable," there is no evidence that Watkins made a pass at Clayton during the call, or otherwise engaged in any sexual innuendo.  However, the Court recognizes the obvious impropriety of a ninety-minute weekend phone call, during which a male supervisor, under the guise of seeking a restaurant recommendation, asks his female employee prying questions about her age, race, and family background.  There is no evidence suggesting that Clayton welcomed or condoned Watkins' conduct, at all. Indeed, the record is replete with evidence suggesting that Clayton and other female employees were uncomfortable even being in Watkins' presence. *See, e.g.*, *Clayton Dep.*

[#41-2] at 99, 107; *Vinet Dep.* [#41-3] at 36-43; *Ontiveros Dep.* [#41-5] at 16-18; *Wilhelmi Aff. Dep. Ex. 31* [#41-21].

Given the fairly steady barrage of gender-specific, sexually-charged conduct that Plaintiff is alleged to have been subjected to over a relatively short period of time, a rational factfinder could conclude that the gender-based harassment was so pervasive, such that Plaintiff's workplace was "permeated with discriminatory intimidation, ridicule, and insult."  *Delsa*, 976 F.3d at 1176; *see, e.g.*, *Gordon v. CompResults, LLC*, No. 11-2547, 2013 WL 656886, at *11 (D. Kan. Feb. 22, 2013) (finding disputed issues of material fact which precluded summary judgment on a sexually hostile work environment claim, where there was evidence that, over the course of two years, the plaintiff's supervisor "displayed provocative photographs of women on his computer," "had physical romantic interactions in the office" with another female employee, made jokes on several occasions "about employees or clients belonging to an advocacy group for pedophiles," and made "profane jokes" at a business meeting regarding "women's hormones").   Therefore, Defendants are not entitled to summary judgment based on the "severity or pervasiveness" element of Plaintiff's Title VII hostile work environment claim.

### b.  Faragher/Ellerth *Affirmative Defense*

Defendants next argue that, even if the conduct alleged by Clayton was severe and pervasive, Dreamstyle is not liable for the sexual harassment, as a matter of law. *Motion* [#37] at 18-21.  In making that argument, Defendants invoke the *Faragher/Ellerth* affirmative defense.  *Id.*

Under Title VII, employers are not automatically liable for sexual harassment perpetrated by their employees.  *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).  Rather, an employer may be liable for the sexually harassing conduct of an employee, under either of two theories. *Helm v. Kansas*, 656 F.3d 1277, 1285 (10th Cir. 2011).  First, "an employer is directly liable for an employee's unlawful harassment if the employer was negligent with respect to the offensive behavior."  *Kramer v. Wasatch Cnty. Sheriff's Office*, 743 F.3d 726, 737 (10th Cir. 2014) (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013)).  This requires a showing that the employer "knew or should have known about the conduct and failed to stop it."  *Ellerth*, 524 U.S. at 758-59.  Second, where, as here, the alleged harassment is attributed to a supervisor with immediate authority over the plaintiff rather than a mere coworker,[14] "the employer may be vicariously liable for the conduct, depending on the circumstances."  *Kramer*, 743 F.3d at 737 (citing *Vance*, 570 U.S. at 427).  Here, it is clear from the record that Plaintiff seeks to hold Defendants liable under a theory of vicarious liability only.[15]

---

[14] There is no dispute that, throughout Clayton's tenure with Dreamstyle, Watkins was her "supervisor," within the meaning of Title VII.  *See Kramer*, 743 F.3d at 737-38 (discussing what constitutes a "supervisor" under the statute).

[15] Clayton neither argues, nor proffers evidence showing, that Dreamstyle knew or should have known about the sexual harassment and failed to stop it.  Indeed, all of the incidents that Plaintiff points to as evidence of sexual harassment occurred *before* August 26, 2019, the date on which she first complained to her employer about Watkins' conduct.  As such, Plaintiff has failed to raise a genuine issue of fact as to whether Defendants can be held liable for the alleged sexual harassment under a theory of negligence.

"[A]n employer is subject to vicarious liability for actionable sexual harassment perpetrated by a supervisor with immediate (or successively higher) authority over the victimized employee in two situations."   *Helm*, 656 F.3d at 1285.   First, where "the supervisor's harassment culminates in a tangible adverse employment action" for the plaintiff, "such as a discharge, demotion, or undesirable reassignment," the employer is "strictly liable" for the sexual harassment with no defense.   *Id.* (citing *Faragher*, 524 U.S. at 808; *Ellerth*, 524 U.S. at 765).   Where, as here, the harassment does not result in a tangible adverse employment action,[16] the employer can avoid liability by invoking what is commonly referred to as the "*Faragher/Ellerth*" affirmative defense.   *Id.* (citing *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765).

The *Faragher/Ellerth* affirmative defense "comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."   *Id.*   In other words, the employer "must prove both that it *acted* reasonably in preventing and correcting harassment and that the victimized employee unreasonably *failed to act* by not utilizing complaint opportunities."   *Kramer*, 743 F.3d at 746 (emphasis in original).   "The defendant bears the burden to prove both prongs of the defense by a preponderance of the evidence."   *Id.* (citing *Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1228 (10th Cir. 2000)); *accord Faragher*, 524 U.S. at 807-08.

---

[16] As discussed *infra* in the analysis of Plaintiff's Title VII sex discrimination and retaliation claims, the Court does not find that Plaintiff suffered an adverse employment action, as a matter of law.

"To win summary judgment on the *Faragher/Ellerth* defense, an employer must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial." *Kramer*, 743 F.3d at 746 (alterations, internal quotation marks, and citation omitted).  The employer "'must demonstrate that no disputed material fact exists regarding the affirmative defense asserted' when the evidence is viewed in the light most favorable to the plaintiff." *Id.* (quoting *Helm*, 656 F.3d at 1284); *see also EEOC v. The Spud Seller, Inc.*, 899 F. Supp. 2d 1081, 1095 (D. Colo. 2012) ("Because the employer bears the burden of proof on this defense, summary judgment cannot be entered if there is a dispute as to a material fact.").  "Even on undisputed facts, however, 'the judgment call as to reasonableness is itself a jury issue unless no reasonable jury could decide it in the plaintiff's favor.'" *Kramer*, 743 F.3d at 746 (citation omitted).

"The first element of the *Faragher/Ellerth* defense actually imposes two distinct requirements on an employer: (1) the employer must have exercised reasonable care to prevent sexual harassment and (2) the employer must have exercised reasonable care to correct promptly any sexual harassment that occurred." *Id.* at 1288 (citing *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1062 (10th Cir. 2009)).  Prevention may be shown by the existence of a sexual harassment policy that is disseminated to employees. *Id.* at 1288-89.  As to the correction requirement, Dreamstyle must "show that it acted reasonably promptly on [Clayton's] complaint when it was given proper notice of her allegations as required under its complaint procedures." *Id.* at 1290 (internal quotation marks omitted).  "The most significant immediate measure an employer can take in

response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified." *Id.* (citation omitted).

Here, Dreamstyle argues that it took reasonable care to "promptly correct" the sexual harassment about which Clayton complained, because "as soon as Clayton properly raised her concerns with to [sic] Chavez and MacGillivray, Dreamstyle immediately investigated and then addressed them with written corrective action the next week, one step below termination." *Motion* [#37] at 19.  Clayton, on the other hand, points to the audio recording of the August 29, 2019 telephone call, during which Chavez and MacGillivray questioned Watkins about her allegations, as evidence that Dreamstyle did not take reasonable care "to investigate, prevent, or correct" Watkins' sexually harassing behavior.  *Response* [#41] at 22; *see August 29th Recording* [conventionally filed]. Plaintiff references various statements made by Chavez and MacGillivray during the call, suggesting that the investigation into her allegations would be perfunctory, at best.  *Id.* Defendants do not dispute what was said during the August 29, 2019 recording, only how that evidence should be characterized.  *Reply* [#45] at 3 ¶¶ 18-19.

Having considered the parties' arguments, as well as the evidence, the Court finds that there is a disputed fact issue as to whether Dreamstyle took reasonable care to correct claims of sexual harassment of which it was aware.  *See Kramer*, 743 F.3d at 747-50 (finding a disputed fact issue as to whether the employer's response to the plaintiff's sexual harassment complaint was reasonable, where the employer did not provide any evidence showing that the "interventions were reasonably calculated to end the harassment, deter future harassers, or protect" the plaintiff, and where the parties

"hotly" disputed what happened at the meeting called by the employer in response to the plaintiff's complaint).  Therefore, Defendants have failed to satisfy the first element of the *Faragher/Ellerth* affirmative defense.  For that reason, Defendants are not entitled to summary judgment based on their invocation of that defense.[17]  *Helm*, 656 F.3d at 1291.

Accordingly, based on the foregoing, Defendants' motion for summary judgment on Plaintiff's Title VII hostile work environment claim is **DENIED**, and the claim may proceed to trial.

### 3.  The Sex Discrimination Claim

Plaintiff also alleges a Title VII sex discrimination claim based on disparate treatment.  *Am. Compl.* [#15] at 13-15 ¶¶ 64-78.  Defendants move for summary judgment on that claim, arguing that Plaintiff has failed to make out a *prima facie* case of discrimination.[18]  *Motion* [#37] at 22-24.

To establish a *prima facie* case of sex discrimination under Title VII, a plaintiff must show: (1) membership in a protected class; (2) an adverse employment action; and (3) the adverse employment action "occurred under circumstances giving rise to an inference of discrimination."  *Luster v. Vilsack*, 667 F.3d 1089, 1095 (10th Cir. 2011) (citing *PVNF*, 487 F.3d at 800).

---

[17] Because Dreamstyle has failed to establish the first element of the *Faragher/Ellerth* defense, the Court need not address the second element of the defense.  *Kramer*, 743 F.3d at 746 ("The employer will lose this defense if it fails either prong.").

[18] As discussed *supra*, Title VII discrimination and retaliation claims, unlike Title VII hostile work environment claims, are analyzed under the *McDonnell Douglas* burden-shifting framework.

Here, Defendants argue that Plaintiff cannot satisfy the second element of her *prima facie* case, because there is no evidence that she was ever subjected to an adverse employment action.  *Motion* [#37] at 22-24.  Defendants contend, specifically, that "[t]he undisputed facts" show that Plaintiff "chose to take a voluntary leave of absence," that "Dreamstyle repeatedly made clear that her job was waiting for her," and that Plaintiff "simply refused to return to work because she did not want to report to Watkins anymore[.]"  *Id.* at 23-24.

Plaintiff, in response, argues that she did, in fact, suffer an adverse employment action "in the form of sexual harassment, retaliation for lodging a complaint, and not being permitted to return to work in any capacity except under her harasser."  *Response* [#41] at 19 n.2.  To the extent that Plaintiff predicates her disparate treatment claim on "harassment" and/or "retaliation," she provides no argument or evidentiary support.  The Court agrees with Defendants that Plaintiff's Title VII sex discrimination claim based on either "harassment" or "retaliation" is redundant of, and subsumed by, her other Title VII claims.[19]  *Reply* [#45] at 19; *see Johnson v. Midlands Tech. Coll. Found.*, No. 3:08-803-JFA-PJG, 2009 WL 3063048, at *12 (D. S.C. Sept. 21, 2009) (finding no viable sex discrimination claim, where the plaintiff did not point to any evidence of an adverse employment action apart from her allegations of a hostile work environment).  Therefore,

---

[19] Plaintiff also argues that, due to the "intertwined" nature of her sex discrimination and hostile work environment claims, the "separate analysis" of the sex discrimination claim is "misplaced." *Response* [#41] at 19 n.2.  It is unclear from this statement whether Plaintiff is abandoning her sex discrimination claim altogether, as Defendants argue in their reply brief.  *Reply* [#45] at 18. Thus, in an abundance of caution, the Court will proceed with its analysis of the sex discrimination claim.

the Court considers only whether, by "not being permitted to return to work in any capacity except under her harasser," Plaintiff suffered an adverse employment action.

"[T]he substantive discrimination provisions of Title VII are limited 'to adverse actions that affect employment or alter the conditions of the workplace.'" *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007) (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 62 (2006)) (alteration omitted).  In the Tenth Circuit, the phrase "adverse employment action" is "liberally" defined, in that "[s]uch actions are not simply limited to monetary losses in the form of wages or benefits."  *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1217 (10th Cir. 2003) (quoting *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998)).  In determining whether an employee has suffered an adverse employment action, the Court must "take a case-by-case approach, examining the unique factors relevant to the situation at hand."  *Id.*  At minimum, a plaintiff must show an "objective demotion," or some other "significant change in employment status," such as termination, a decrease in pay, a reassignment with markedly different responsibilities, or "a decision causing a significant change in benefits."  *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 635 (10th Cir. 2012) (quoting *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007)); *accord Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1316 (10th Cir. 2017).  "Proof of either actual or constructive discharge satisfies this requirement."  *Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 979 (10th Cir. 2008) (citation omitted).  But a "mere inconvenience or an alteration of job responsibilities" will not suffice.  *Hiatt*, 858 F.3d at 1316 (quoting *Piercy*, 480 F.3d at 1203); *see Robinson v. Cavalry Portfolio Servs., LLC*, 365 F. App'x 104, 114 (10th Cir. 2010) ("While adverse employment actions extend

beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action.  Otherwise, minor and even trivial employment actions . . . would form the basis of a discrimination suit.").

Turning to its analysis, the Court considers, first, whether the evidence establishes Plaintiff's actual discharge.  "An actual discharge . . . occurs when the employer uses language or engages in conduct that would logically lead a prudent person to believe [her] tenure has been terminated."  *Fischer*, 525 F.3d at 979-80 (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 88 (2d Cir. 1996)).  "An actual discharge does not occur, however, when the employee chooses to resign rather than work under undesirable conditions."  *Id.* at 980 (citation omitted).

Here, the record unequivocally shows that Plaintiff took a leave of absence from her position at Dreamstyle, and then did not ever return.  Further, Defendants have produced uncontroverted evidence showing that, as recently as April 1, 2020, Plaintiff was still classified as an "active" Dreamstyle employee.[20]  *MacGillivray Decl.* [#37-1] ¶ 25. Therefore, because Clayton effectively resigned, she cannot rely on a theory of actual discharge to prove her *prima facie* case.  *See Fischer*, 525 F.3d at 980.

"Even if an employee resigns, the plaintiff may still satisfy the adverse employment action requirement by demonstrating that [s]he was constructively discharged."  *Fischer*, 525 F.3d at 980.  However, the burden to establish constructive discharge "is substantial." *Id.* (citing *EEOC v. PVNF, LLC*, 487 F.3d 790, 805 (10th Cir. 2007)).  "A constructive

---

[20] Plaintiff attempts to rebut this evidence, claiming that it is "nonsense."  *Response* [#41] at 9 ¶ 44.  However, she points to no evidence reasonably suggesting otherwise.

discharge occurs only 'when an employer, through unlawful acts, makes working conditions so intolerable that a reasonable person in the employee's position would feel compelled to resign.'" *Id.* (quoting *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135 (10th Cir. 2004)).  "The question is not whether the employee's resignation resulted from the employer's actions, but whether the employee had any other reasonable choice but to resign in light of those actions." *Tran v. Trs. of State of Colls. of Colo.*, 355 F.3d 1263, 1270 (10th Cir. 2004) (citation omitted).  In other words, the employee must show that she had "*no other choice* but to quit." *Yearous v. Niobrara Cnty. Mem. Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997) (citations omitted) (emphasis in original).  Whether an employee's resignation is voluntary is evaluated objectively, based on the totality of the circumstances. *Fischer*, 525 F.3d at 980 (citing *Exum*, 389 F.3d at 1136); *Tran*, 355 F.3d at 1270 ("[W]e apply an objective test under which neither the employee's subjective views of the situation, nor the employer's subjective intent . . . are relevant.").

Here, Plaintiff argues that she was "not [] permitted to return to work in any capacity except under her harasser." *Response* [#41] at 19 n.2.  To the extent that Plaintiff is claiming that she was constructively discharged,[21] the Court disagrees.  The uncontroverted record shows that, when Clayton notified Dreamstyle of her decision to take a leave of absence, the investigation into her allegations had only just begun, and she still had the opportunity to discuss the terms and conditions of her employment with

---

[21] In an unrelated portion of her Response, Plaintiff appears to disavow any claim of a constructive discharge. *Response* [#41] at 29 n.6 ("Note, even Defendants' insistence that Plaintiff claims constructive discharge (which she does not), does not lead to a different conclusion.").

Dreamstyle management.  Clayton devotes large portions of her Response to arguing that the investigation, itself, was a sham, and that Dreamstyle essentially forced her out by refusing to provide her with a means to avoid being "subject to Watkins' supervision" in the interim.  Notably, however, Clayton neither argues, nor points to evidence showing, any particular modification to her work circumstances that she desired or proposed, much less that Dreamstyle refused to provide.  Indeed, during the August 28, 2019 phone call between Clayton and MacGillivray, MacGillivray repeatedly asked Clayton what she needed or wanted from Dreamstyle to make her "more comfortable" as the investigation proceeded.  *August 28th Recording* [conventionally filed] at 13:11-18:48.  Clayton, however, did not articulate any specific change to her work arrangements that she desired, other than to simply "avoid" Watkins.[22]  *Id.*  Clayton and MacGillivray were ultimately unable to reach any consensus as to how to achieve this, and at the end of the call, MacGillivray agreed to Clayton's request for additional time to think things over.  *Id.* at 16:12-18:48.  There is no evidence that Plaintiff asked her employer for any particular accommodation or modification to her work environment (*e.g.,* working remotely, or at a different branch location) subsequent to the August 28, 2019 phone conversation with MacGillivray.  Nor did Plaintiff ever take up MacGillivray's multiple offers to discuss the matter further.  Rather, the morning after speaking with MacGillivray on the telephone,

---

[22] When MacGillivray asked Clayton what "avoiding" Watkins would "entail," Clayton responded, "I mean, I don't know if I'd just work with Alex [Vinet] . . . but I don't know about, you know, how that would even work[.]"  *August 28th Recording* [conventionally filed] at 14:20-14:35. MacGillivray then raised the possibility that Clayton "would not be involved with the business for a couple of days," though he made clear throughout the phone conversation that any such decision was Clayton's to make.  *Id.* at 15:12-16:11.

Clayton commenced a voluntary leave of absence, from which she elected never to return.[23] *Luchaco v. Colo. State Patrol*, No. 08-cv-02348-LTB-KMT, 2010 WL 3430850, at *15 (D. Colo. Aug. 30, 2010) (holding that a plaintiff failed to create a genuine issue of material fact as to whether she was constructively discharged, where the undisputed evidence showed that the plaintiff "voluntarily, without being asked or threatened, submitted her letter of resignation").   It is clear from the record that, at the time that Clayton left Dreamstyle, she still had an ability to negotiate with the company regarding her work conditions, and thus, at least one alternative to quitting was still available to her. *See Potts v. Davis Cnty.*, 551 F.3d 1188, 1194 (10th Cir. 2009) (stating relevant factors to include "whether [the Title VII plaintiff] was given some alternative to resignation"); *Exum*, 389 F.3d at 1136 (finding an employee's resignation to be voluntary, where the evidence showed that, "[i]nstead of resigning, [he] could have chosen to comply with his superior's order or, alternatively, refused to comply and faced the possible consequences of that choice," and where, even after the employee resigned, his employer "provided him with alternatives to quitting and offered to investigate his complaints"); *c.f. Barone v. United Airlines, Inc.*, 355 F. App'x 169, 181-82, 185 (10th Cir. 2009) (holding that an employee's resignation amounted to a constructive discharge, where the plaintiff's supervisor gave her "only two alternatives"—immediately resign or face a definite and immediate demotion and transfer—"without contingencies, and without any opportunity

---

[23] In her email notifying Dreamstyle of her decision to take a leave of absence, Clayton wrote that she could not work under Watkins, either "directly or indirectly."  *Carroll Decl. Dep. Ex. 14* [#37-17].  The wording suggests that Plaintiff did not believe any accommodation or modification to her work environment, even if provided by her employer, would suffice.

for [the plaintiff] to avoid these options"); *see also Hines v. Metro Work Ctr., Inc.*, No. CIV. 991971DSDJMM, 2001 WL 705886, at *4 (D. Minn. June 19, 2001) (holding that there was no constructive discharge, where the plaintiff was informed by his employer that his failure to return to work at the end of his approved leave of absence "would be treated as a voluntary separation," and where the plaintiff then "took no action to return and did not inform his employer that he intended to return").  Further, after Clayton took a leave of absence, Dreamstyle repeatedly assured her that she would be reinstated to her position, should she choose to return.  *See Sampson v. Kane is Able, Inc.*, 812 F. App'x 746, 750-51 (10th Cir. 2020) (finding no constructive discharge arising from a one-week unpaid suspension, where rather than giving the plaintiff "no choice but to quit," the employer "repeatedly asked him to return as a lift-truck operator with a 6.7% pay cut").  Accordingly, Clayton has failed to show that she was constructively discharged.

On this record, then, Plaintiff has failed to raise a genuine issue of material fact on whether she suffered an adverse employment action.  Without evidence of an adverse employment action, Plaintiff cannot establish a *prima facie* case of sex discrimination under Title VII.  Accordingly, Defendants' motion for summary judgment as to this claim is **GRANTED**.

### 4.  The Retaliation Claim

Clayton also alleges that she was unlawfully retaliated against for making a harassment complaint against Watkins.  *Am. Compl.* [#15] at 18-20 ¶¶ 94-106. Dreamstyle moves for summary judgment on this claim, on the grounds that Clayton cannot establish the required elements of her *prima facie* case.  *Motion* [#37] at 24-26.

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show: (1) engagement in activity protected under Title VII; (2) a "materially adverse" employment action; and (3) a causal connection between the protected activity and the materially adverse employment action. *Singh v. Cordle*, 936 F.3d 1022, 1042 (10th Cir. 2019) (citing *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006)).

In their motion for summary judgment, Defendants argue, first, that Plaintiff has failed to adduce adequate evidence showing that she was subject to any materially adverse action. *Motion* [#37] at 24-25. On this issue, the Court agrees with Defendants.

A challenged employer action is "materially adverse," for purposes of a Title VII retaliation claim, when it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1316 (10th Cir. 2017) (quoting *White*, 548 U.S. at 68). This is a "broader standard" that that which is applicable to Title VII discrimination claims. *Barone v. United Air Lines, Inc.*, 355 F. App'x 169, 183 (10th Cir. 2009). "[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *White*, 548 U.S. at 64. However, to be actionable, the retaliatory conduct must "produce[] an injury or harm" that rises above the types of "petty slights, minor annoyances, and simple lack of good manners" that are typical to many workplaces. *Id.* at 67-68. The material adversity standard "focuses on the employer's retaliatory action, not the underlying discrimination the employee had opposed." *Semsroth v. City of Wichita*, 555 F.3d 1182, 1184 (10th Cir. 2009). The standard is an objective one, "judged from the perspective of a reasonable person in the plaintiff's position, considering all the

circumstances." *White*, 548 U.S. at 71; *see id.* (stating that the "plaintiff's personal feelings" are irrelevant to this inquiry). "[T]he significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *White*, 548 U.S. at 69 ("A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.").

In support of her retaliation claim, Clayton identifies the following materially adverse actions purportedly taken by Dreamstyle in retaliation for her complaints of harassment against Watkins:

- August 26th and after: Plaintiff's standing with Defendants is ruined.
- August 27th and after: Plaintiff forced to take an unpaid leave for reporting sexual harassment or continue working under Watkins' [sic] during the investigation.
- August 27th and after: Dreamstyle refuses to allow or even offer Plaintiff to return to work under any circumstances that did not have Watkins as her manager.
- August 28th: Watkins requests Vinet terminate Plaintiff.
- August 28th: Watkins informs sales team Plaintiff would not be with Dreamstyle.
- August 29th and after: Defendants attempt to create post-complaint poor performance documentation against Plaintiff.
- August 29th: Watkins requests Vinet draft a disparaging document about Plaintiff's performance to be used to terminate Plaintiff.
- September 5th – October 3rd: Plaintiff placed on unreasonably long unpaid leave of absence (including not being able to perform any work).

*Response* [#41] at 26-27. The majority of these incidents do not satisfy the material adversity standard, and can be quickly dispensed with on that basis. First, to the extent that Clayton alleges that her "standing" with her employer was "ruined," the allegation is

impermissibly vague, and unsupported by any citation to the record.  To the extent that Plaintiff alleges that, on August 28, 2019, Watkins attempted to have her fired and also informed the sales team that she would no longer be with Dreamstyle, it is uncontroverted that Watkins did not learn of Plaintiff's protected activity, *i.e.,* her formal harassment complaint, until August 29, 2019.  *Watkins Decl.* [#37-5] ¶ 4.  Thus, any action taken by Watkins before August 29, 2019 cannot form the basis for Clayton's retaliation claim, as a matter of law.  *See Davis v. Unified Sch. Dist. 500*, 750 F.3d 1168, 1172-73 (10th Cir. 2014) (affirming summary judgment dismissal of a Title VII retaliation claim, where there was "no evidence of any [decisionmaker]'s knowledge of [the plaintiff's] protected activity," and "no reason to impute the HR Department's knowledge to any of them"); *see also Featherson v. Montgomery Cnty. Pub. Schs.*, 739 F. Supp. 1021, 1025-26 (D. Md. 1990) ("As a matter of logic and fact, a person cannot make an adverse, retaliatory decision based upon information of which s/he is unaware.").  As to Dreamstyle's "attempt to create post-complaint poor performance documentation against Plaintiff," and Watkins' request that Vinet "draft a disparaging document about Plaintiff's performance," there is no evidence that such documents were ever actually created or drafted.  Mere attempted action does not suffice to show a materially adverse employment action.  *See Petersen v. Utah Dep't of Corrs.*, 301 F.3d 1182, 1190 (10th Cir. 2002) (holding that an employer's aborted attempt to transfer the plaintiff "was not a materially adverse action"); *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 533 (10th Cir. 1998) (holding that a supervisor's unrealized threat to "write [the plaintiff] for insubordination" did not rise to the level of a

materially adverse action).  Further, Plaintiff does not proffer any evidence to show that either action caused her to suffer injury or harm.  *White*, 548 U.S. at 67.

Clayton also argues that Dreamstyle retaliated against her, by forcing her "to take an unpaid leave for reporting sexual harassment or continue working under Watkins[] during the investigation;" by then refusing "to allow or even offer" her the ability "to return to work under any circumstance that did not have Watkins as her manager;" and by ultimately placing her "on an unreasonably long unpaid leave of absence[.]"  *Response* [#41] at 26-27.  In essence, Plaintiff contends that her employer should have offered her some sort of option to keep working (*i.e.,* continue getting paid) during the pendency of the investigation into her harassment complaint, under circumstances where she would not have to communicate with, or be in any proximity to, Watkins.[24]  Clayton's argument, it seems, is that by failing to take such action, Dreamstyle retaliated against her. However, Plaintiff provides no legal support for that contention.  Nor has the Court been able to locate any decision holding that an employer's failure to take affirmative corrective action constitutes an adverse employment action under the antiretaliation provision of Title VII.  To the contrary, courts have frequently held that an employer's failure to act in response to a plaintiff's discrimination complaint, or to take particular corrective action that the plaintiff desires, does not amount to a materially adverse employment action for

---

[24] To the extent that Plaintiff is arguing that Defendants' purportedly binary choice between taking unpaid leave and continuing to work under Watkins amounted to a constructive discharge, as discussed *supra*, Plaintiff has failed to raise a genuine issue of material fact as to whether she had no other option but to quit.  Accordingly, Plaintiff cannot rely on constructive discharge as a materially adverse action for her retaliation claim.  *See VonLintel v. Eagle Commc'ns, Inc.*, No. 14-4125-KHV, 2016 WL 7179465, at *13 (D. Kan. Dec. 9, 2016) (holding that the plaintiff could not rely on a constructive discharge theory to support her Title VII retaliation claim under such circumstances).

purposes of establishing a *prima facie* retaliation case.  *See, e.g.*, *VonLintel v. Eagle Commc'ns, Inc.*, No. 14-4125-KHV, 2016 WL 7179465, at *13 (D. Kan. Dec. 9, 2016) (holding that an employer's failure to investigate the plaintiff's complaints and take corrective action did not constitute a materially adverse employment action); *Turrentine v. United Parcel Serv., Inc.*, 645 F. Supp. 2d 976, 990-91 (D. Kan. 2009) (finding no material adverse action arising from the employer's failure to fulfill its promise of pushing back the plaintiff's start time by thirty minutes so that she could avoid "the discomfort" of seeing her alleged harasser, given that there was no evidence that the challenged action would have required the plaintiff to be alone, or even in close quarters, with the harasser); *see also Cooper v. Smithfield Packing Co.*, 724 F. App'x 197, 202 (4th Cir. 2018) (finding no materially adverse action where employers allegedly failed to investigate the plaintiff's sexual harassment complaint, failed to transfer either the plaintiff or her harassing supervisor to a different work department, and disregarded the plaintiff's concerns that the supervisor's conduct was affecting her ability to work); *Yeager v. UPMC Horizon*, 698 F. Supp. 2d 523, 546-47 (W.D. Penn. 2010) (holding allegations—that the plaintiff "was forced to take a medical leave of absence because [her employer] failed to take corrective action once it learned about the alleged sexual harassment"—failed to show a materially adverse action); *Smith v. Jackson*, 539 F. Supp. 2d 116, 141-42 (D.D.C. 2008) (finding no materially adverse action arising from the plaintiff's "dissatisfaction at being ordered to work in close physical proximity" to his alleged harasser, where the plaintiff was not required to have any direct contact with the harasser).  And, there is no evidence that Dreamstyle actually refused to provide Clayton with any particular means to "avoid"

Watkins.  Further, although Clayton argues that Dreamstyle "forced" her to take an unpaid leave of absence, the uncontroverted evidence shows that Clayton made the decision to do so herself, after taking time to consider her options and to discuss the matter with her husband.  *See Willis v. Cleveland Cnty., N.C.*, No. 1:18-cv-00292-MR-WCM, 2020 WL 3578297, at *8 (W.D.N.C. July 1, 2020) (finding no materially adverse action arising from an employer's failure to "fully" investigate the plaintiff's sexual harassment complaint, to take "appropriate action" against the plaintiff's harasser, or to keep the plaintiff "informed about the investigation," and also noting that the plaintiff "chose to resign while the investigation was pending, and her voluntary resignation is not an adverse employment action").  The record likewise shows that, even after Clayton notified Dreamstyle of her decision to take leave, the company repeatedly assured her that she would be unconditionally reinstated to her position, should she desire to return.  *MacGillivray Decl. Dep. Ex. 26* [#37-3] & *Dep. Ex. 18* [#37-2] at 1.  Plaintiff argues that Dreamstyle's assurances regarding her position were "disingenuous," though she points to nothing other than her own speculative belief as support.  *Response* [#41] at 8 ¶ 32.

On this record, then, the evidence does not raise a genuine issue of material fact regarding whether Plaintiff suffered a materially adverse action.  As such, Plaintiff cannot establish a *prima facie* case of retaliation under Title VII.  Therefore, Defendants' motion for summary judgment on Plaintiff's Title VII retaliation claim is **GRANTED**.

## B.  The CADA Claims

Clayton asserts parallel claims under CADA for sex discrimination, retaliation, and harassment.  *Am. Compl.* [#15] at 21-28 ¶¶ 107-51.  "Colorado has adopted the same

standards applicable to Title VII cases when considering claims brought under [CADA]." *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1219 (10th Cir. 2003) (citing *Colo. Civil Rights Comm'n v. Big O Tires, Inc.*, 940 P.2d 397, 400-01 (Colo. 1997)); *see also Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1219 n.11 (10th Cir. 2010) ("Colorado and federal law apply the same standards to discrimination claims").  The Court's foregoing analysis of the Title VII clams applies equally to the CADA claims.  *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 n.3 (10th Cir. 2012) (stating that "any determination" on a plaintiff's Title VII claims would "necessarily also determine" the plaintiff's corresponding CADA claims); *accord Johnson*, 594 F.3d at 1219 n.11 (stating that such claims "rise or fall together").  Therefore, because Plaintiff has failed to create a genuine issue of material fact as to her Title VII sex discrimination and retaliation claims, Defendants are entitled to summary judgment on the corresponding CADA claims, as well.  *See Stinnett*, 337 F.3d at 1219 (affirming the dismissal of a CADA claim, based on the failure to establish a parallel claim under Title VII).  Given that Plaintiff has adduced enough evidence to avoid summary judgment on her Title VII hostile work environment claim, her CADA hostile work environment claim likewise survives.

Accordingly, Defendants' motion for summary judgment Plaintiff's CADA sex discrimination and retaliation claims is **GRANTED**.  Defendants' motion for summary judgment on Plaintiff's CADA hostile work environment claim is **DENIED**.

### C.  Damages

Finally, Defendants move for partial summary judgment on Plaintiff's request for damages. *Motion* [#37] at 27-28.  Dreamstyle argues, specifically, that because Clayton

"rejected" its September 5, 2019 "unconditional offer of reinstatement" merely "for personal reasons," Clayton cannot recover damages for back pay or front pay in lieu of reinstatement, as a matter of law. *Id.*

An aggrieved Title VII plaintiff may be entitled to an award of reinstatement, back pay, or front pay. 42 U.S.C. § 2000e-5(g)(1). "Of these three damage awards, reinstatement is preferable." *Herrera v. Int'l Brotherhood of Elec. Workers Union, Local 68*, 228 F. Supp. 2d 1233, 1246 (D. Colo. 2002) (citing *Bruno v. W. Elec. Co.*, 829 F.2d 957, 966 (10th Cir. 1987)). However, "the equitable remedy of front pay may be awarded where an employer has created such a hostile work environment that reinstatement is not a reasonable remedy[.]" *Griffith v. Colo. Div. of Youth Serv.*, 17 F.3d 1323, 1329 (10th Cir. 1994).

"[A] plaintiff's unreasonable rejection of an unconditional offer of reinstatement will cut off an employer's liability for damages [under Title VII] as of the date the offer is rejected or expires." *Albert v. Smith's Food & Drug Ctrs., Inc.*, 356 F.3d 1242, 1253 (10th Cir. 2004) (quoting *Ford Motor Co. v. EEOC*, 458 U.S. 219, 230-32 (1982)). "In determining whether the right to relief extends beyond the date of an offer of reinstatement, the trial court must consider the circumstances under which the offer was made or rejected, including the terms of the offer and the reasons for refusal." *Giandonato v. Sybron Corp.*, 804 F.2d 120, 124 (10th Cir. 1986) (citation omitted). "[A]n offer rejected solely for personal reasons," such as apprehension over working under a particular supervisor, "will not avoid the rule" allowing the defendant to cut off damages. *Albert*, 356 F.3d at 1253; *see also id.*

Here, Defendants have submitted uncontroverted evidence showing that, on September 5, 2019, Dreamstyle offered to reinstate Clayton to her previous position with the company. *MacGillivray Decl. Dep. Ex. 26* [#37-3]. It is undisputed that the offer of reinstatement, which Dreamstyle reiterated to Clayton on October 3, 2019, was unconditional. *Id.*; *MacGillivray Decl. Dep. Ex. 18* [#37-2]. There is no evidence that Clayton ever accepted the offer, or that she ever attempted to obtain further clarity from Dreamstyle as to the offer's terms. Defendants argue that Plaintiff's failure to accept the offer of reinstatement precludes her from recovering back pay or front pay after September 5, 2019, the date on which the offer was first made. *Motion* [#37] at 28. Plaintiff, for her part, fails to direct the Court to any evidence suggesting that the offer of reinstatement was unreasonable. *See Reply* [#45] at 1-2, 20. Nor does Plaintiff provide the Court with any explanation as to why she did not accept the offer. Indeed, Plaintiff's response brief does not address Defendants' arguments concerning damages, at all.

On this record, then, Plaintiff has failed to meet her summary judgment burden to show the existence of a genuine issue of material fact with regard to her rejection of Defendants' unconditional offer of reinstatement. Plaintiff's refusal of her employer's September 5, 2019 offer of reinstatement to her previous position, thus, "eliminated any viable claim [she] may otherwise have had" for back pay or front pay beyond that date. *Giandonato*, 804 F.2d at 125. Therefore, Defendants' motion for partial summary judgment on damages is **GRANTED**. For that reason, and as a matter of law, Plaintiff's possible award of back pay and/or front pay, if any, is tolled as of September 5, 2019.

Accordingly, it is

**ORDERED** that the "Defendants' Motion for Summary Judgment" [#37] is **GRANTED, in part**, and **DENIED, in part**.  Specifically, summary judgment is **DENIED** as to Plaintiff's hostile work environment claims under Title VII and CADA, and those claims may **PROCEED**.  Defendants' motion for summary judgment is **GRANTED** as to all remaining claims.

Dated this 28th day of March, 2022.

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge